Paul R. Kiesel, State Bar No. 119854
*kiesel@kiesel.law*
Jeffrey A. Koncius, State Bar No. 189803
*koncius@kiesel.law*
Nicole Ramirez, State Bar No. 279017
*ramirez@kiesel.law*
**KIESEL LAW LLP**
8648 Wilshire Boulevard
Beverly Hills, CA 90211-2910
Tel.: 310-854-4444
Fax: 310-854-0812

Barry. R. Eichen [Admitted *Pro Hac Vice*]
*beichen@njadvocates.com*
Evan J. Rosenberg [Admitted *Pro Hac Vice*]
*erosenberg@njadvocates.com*
Ashley A. Smith [Admitted *Pro Hac Vice*]
*asmith@njadvocates.com*
**EICHEN CRUTCHLOW ZASLOW & McELROY**
40 Ethel Road
Edison, NJ 08817
Tel.: 732-777-0100
Fax: 732-248-8273

Stephen M. Gorny [Admitted *Pro Hac Vice*]
*steve@gornylawfirm.com*
Chris Dandurand [Admitted *Pro Hac Vice*]
*chris@gornylawfirm.com*
**THE GORNY LAW FIRM, LC**
2 Emanuel Cleaver II Boulevard, Suite 410
Kansas City, MO 64112
Tel.: 816-756-5056
Fax: 816-756-5067

Jay Barnes [Admitted *Pro Hac Vice*]
*jaybarnes5@zoho.com*
Rod Chapel [Admitted *Pro Hac Vice*]
*rod.chapel@gmail.com*
**BARNES & ASSOCIATES**
219 East Dunklin Street, Suite A
Jefferson City, MO 65101
Tel.: 573-634-8884
Fax: 573-635-6291

*Attorneys for Plaintiffs*

*(Additional Attorneys Listed on Signature Page)*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

WINSTON SMITH; JANE DOE I; and JANE DOE II, on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

FACEBOOK, INC.; AMERICAN CANCER SOCIETY, INC.; AMERICAN SOCIETY OF CLINICAL ONCOLOGY, INC.; MELANOMA RESEARCH FOUNDATION; ADVENTIST HEALTH SYSTEM; BJC HEALTHCARE; CLEVELAND CLINIC; and UNIVERSITY OF TEXAS - MD ANDERSON CANCER CENTER,

Defendants.

CASE NO. 5:16-cv-01282-EJD

**NOTICE OF MOTION AND MOTION FOR INJUNCTIVE RELIEF; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**

Date: April 13, 2017
Time: 9:00 a.m.
Crtrm.: 4, 5th Floor
Judge: Hon. Edward J. Davila

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

**PLEASE TAKE NOTICE** that, pursuant to Rule 65 of the Federal Rules of Civil Procedure and Civil Local Rules 65-2 and 7-2, on April 13, 2017, at 9:00 a.m., or as soon thereafter as the matter may be heard, before Judge Edward J. Davila of the Northern District of California, Plaintiffs Winston Smith, Jane Doe I, and Jane Doe II, on behalf of themselves and others similarly situated, will and hereby move the Court for injunctive relief against Defendants American Cancer Society, Inc.; American Society of Clinical Oncology, Inc.; Melanoma Research Foundation; Adventist Health System; BJC Healthcare; Cleveland Clinic; University of Texas – MD Anderson Cancer Center; and their agents, employees, and all other persons acting in concert with them (collectively, the "health care Defendants"), requiring them to remove Facebook source code from all of their websites, as set forth below.

Pursuant to the San Jose Judges' Standing Order, Plaintiffs' counsel conferred with health care Defendants' counsel to determine that the proposed hearing date will not cause undue prejudice. Plaintiffs' counsel also informed health care Defendants' counsel that, due to the nature of this Motion, Plaintiffs will move ex parte to advance the hearing date to some time after November 2016, due to the unavailability of their expert, Tim Libert.

Specifically, Plaintiffs seek an Order:

1. Requiring health care Defendants American Cancer Society, Inc.; American Society of Clinical Oncology, Inc.; Melanoma Research Foundation; Adventist Health System; BJC Healthcare; Cleveland Clinic; and University of Texas – MD Anderson Cancer Center to remove all source code from all of their websites that results in the disclosure of information to Facebook through cookies from Facebook.com or any other Facebook subsidiary website, as required by the Health Insurance Portability and Accountability Act of 1996, 42 U.S.C. § 1320d, *et seq.* ("HIPAA"), the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(2)(C) (the "CFAA") and the corresponding computer crime laws of all 50 states, the California Invasion of Privacy Act, Cal. Pen. Code § 630, *et seq.* ("CIPA"), the California Constitution, Art. I, sec. 1, and other state laws restricting disclosure of confidential information.

/ / /

2. Requiring health care Defendants that do not disclose personally identifiable information to Facebook to maintain the status quo.

3. For attorneys' fees and costs in pursuing the present Motion. 18 U.S.C. § 2520(b).

Since the filing of Plaintiffs' Complaint, many of the health care Defendants have continued the practices that Plaintiffs seek to enjoin, warranting injunctive relief at this time. On a daily basis, the health care Defendants continue to disclose to Facebook personally identifiable medical information for numerous individuals, in violation of their privacy rights under the aforementioned federal and state statutes; as such, the harm perpetrated by Defendants' scheme to collect user information is continuously increasing and affecting more and more individuals.

As set forth in Plaintiffs' Motion, Plaintiffs and the putative classes and subclasses (hereinafter, the "Classes") they represent will suffer irreparable harm if the health care Defendants are allowed to continue tracking, collecting, and intercepting users' communications. Moreover, the balance of equities strongly favors Plaintiffs and the Classes, and the requested injunctive relief serves the public interest because the innocent and unnamed parties in this action – namely, the Classes – have been deprived of their right to privacy in their medical information and communications.

This Motion is supported by this Notice of Motion, the Memorandum of Points and Authorities in Support thereof, the Declarations of Timothy Libert, Plaintiffs Winston Smith, Jane Doe I, and Jane Doe II, and Jason "Jay" Barnes filed herewith, all records and papers on file in this action, and such other materials and argument as may be presented before or at the hearing.

DATED: October 14, 2016 **KIESEL LAW LLP**

By: */s/ Jeffrey A. Koncius*
Paul R. Kiesel
Jeffrey A. Koncius
Nicole Ramirez

**TABLE OF CONTENTS**


I. PRELIMINARY STATEMENT ..... 1

II. STATEMENT OF FACTS ..... 1

A. Facts Alleged in the Complaint ..... 1

B. Post-Filing Expert Research ..... 2

C. How Internet Browsers Work and the Disclosure Process ..... 2

D. Post-Filing Disclosures ..... 4

E. The Timing of Disclosures ..... 5

F. The Nature of the Information Disclosed ..... 6

G. Declarations of the Class Representatives ..... 6

III. LEGAL ARGUMENT ..... 7

A. Plaintiffs' Claims Are Likely to Succeed on the Merits ..... 8

1. The Information Disclosed Is Legally-Protected PII ..... 8

2. The Plaintiffs Did Not Consent to the Health Care Defendants' Disclosures ..... 10

3. The Wiretap Act ..... 11

a. Facebook Completed an "Interception" ..... 12

b. Facebook Acquires "Content" ..... 13

c. Facebook Acquires Content of an "Electronic Communication" ..... 14

d. Facebook Acquires Content through the Use of a "Device" ..... 14

e. Facebook Is Not a "Party to the Communication" ..... 14

f. Intentional Post-Filing Conduct ..... 15

g. Post-Filing Disclosures Have Criminal and Tortious Purposes ..... 16

4. CIPA Applies to the Actions of the Health Care Defendants and Plaintiffs Are Likely to Prevail on their Claims ..... 16

5. Plaintiffs Are Likely to Prevail on their Intrusion Upon Seclusion Claims ..... 17

6. Plaintiffs Are Likely to Prevail on their Claims for Violations of their Privacy Rights Under the California Constitution ..... 18

7. Plaintiffs Are Likely to Prevail on their Negligence Per Se Claims ..... 19

8. Plaintiffs Are Likely to Prevail on their Claims for Negligent Disclosure of Confidential Information ..................... 19

9. Plaintiffs Are Likely to Prevail on their Claims for Breach of the Fiduciary Duty of Confidentiality ..................... 20

B. Plaintiffs Will Suffer Irreparable Harm Absent Injunctive Relief ..................... 20

C. The Balance of Equities Tips Sharply in Plaintiffs' Favor ..................... 21

D. The Injunctive Relief Sought Is in the Public Interest ..................... 22

IV. CONCLUSION ..................... 24

## TABLE OF AUTHORITIES

**CASES**

*Benda v. Grand Lodge of the Int'l Ass'n of Machinists & Aerospace Workers*
584 F.2d 308 (9th Cir. 1978) ..... 22

*Berger v. New York*
388 U.S. 41 (1967) ..... 22

*Caribbean Marine Serv. Co. v. Baldridge*
844 F.2d 668 (9th Cir. 1988) ..... 20

*Daniel v. Ford Motor Co.*
806 F.3d 1217 (9th Cir. 2015) ..... 10

*Drakes Bay Oyster Co. v. Jewell*
729 F.3d 967 (9th Cir. 2013) ..... 8

*Friends of Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*
528 U.S. 167 (2000) ..... 21

*Gilder v. PGA Tour, Inc.*
936 F.2d 417 (9th Cir. 1991) ..... 8

*Griswold v. Connecticut*
381 U.S. 479 (1965) ..... 11, 22

*Hill v. NCAA*
7 Cal. 4th 1 (1994) ..... 18

*In re: Application for Pen Register*
396 F. Supp. 2d 45 (D. Mass. 2005) ..... 13

*In re: Carrier IQ, Inc., Consumer Privacy Litig.*
78 F. Supp. 3d 1051 (N.D. Cal. 2015) ..... 14

*In re: Google Cookie Placement*
806 F.3d 125 (3d Cir. 2014) ..... 13

*In re: Pharmatrak*
329 F.3d 9 (1st Cir. 2003) ..... 11, 13, 14

*In re: Zynga Privacy*
750 F.3d 1098 (9th Cir. 2014) ..... 13

*Indep. Living Ctr. of S. Cal., Inc. v. Shewry*
543 F.3d 1047 (9th Cir. 2008) ..... 22

*Kewanee Oil v. Bicron*
416 U.S. 470 (1974) ..... 22

*Lee v. Florida*
392 U.S. 378 (1968) .... 2

*Maxim Integrated Prods, Inc. v. Quintana*
654 F. Supp. 2d 1024 (N.D. Cal. 2009) .... 21

*Meyer v. Kalanick*
No. 15-Civ.-9796, 2016 WL 4073012 (S.D.N.Y. 2016) .... 11

*Neal v. State Farm Ins. Cos.*
10 Cal. Rptr. 781 (1961) .... 10

*Norman-Bloodsaw v. Lawrence Berkeley Lab.*
135 F.3d 1260 (9th Cir. 1998) .... 11, 22

*Opperman v. Path*
87 F. Supp. 3d 1018 (N.D. Cal. 2014) .... 18

*Perkins v. LinkedIn Corp.*
53 F. Supp. 3d 1190 (N.D. Cal. 2014) .... 10

*Pyro Spectaculars North, Inc. v. Sousa*
No. S-12-0299, 2012 WL 968084 (E.D. Cal. Mar. 21, 2012) .... 22

*Riley v. California*
134 S.Ct. 2473 (2014) .... 23

*Shulman v. Group W Prods.*
18 Cal. 4th 200 (1998) .... 17, 18

*Specht v. Netscape*
306 F.3d. 17 (2002) .... 11

*Stanley v. University of So. Calif.*
13 F.3d 1313 (9th Cir. 1994) .... 7

*Summers v. Earth Island Inst.*
555 U.S. 488 (2009) .... 21

*Sussman v. ABC*
186 F.3d 1200 (9th Cir. 1999) .... 16

*U.S. v. Councilman*
418 F.3d 67 (1st Cir. 2005) .... 12

*U.S. v. Eady*
No. 15-3287, 2016 WL 2343212 (3d Cir. May 4, 2016) .... 15

*U.S. v. Szymuskiewicz*
622 F.3d 701 (8th Cir. 2010) .... 12, 14

*Weinberger v. Romero-Barcelo*
456 U.S. 305 (1982) .... 7

*Winter v. Natural Res. Def. Council*
555 U.S. 7 (2008) ........ 7, 20, 21

**STATUTES**

15 U.S.C. § 6501 ........ 6, 8
15 U.S.C. § 6801 ........ 8
18 U.S.C. § 2510(5) ........ 14
18 U.S.C. § 2510(8) ........ 13
18 U.S.C. § 2510(12) ........ 14
18 U.S.C. § 2511(2)(d) ........ 11, 16
20 U.S.C. § 1232 ........ 6, 8
Cal. Civ. Code. § 56.10 ........ 19
Cal. Civ. Code. § 56.36 ........ 19
Cal. Civ. Code § 1798.91 ........ 18, 19
Cal. Evid. Code § 669(a) ........ 19
Cal. Pen. Code § 630 ........ 24
Cal. Pen. Code § 631 ........ 16
Cal. Pen. Code § 631(a) ........ 17
Cal. Pen. Code § 632 ........ 17
Cal. Pen. Code § 637.2(b) ........ 7

**REGULATIONS**

2 C.F.R. § 200.79 ........ 9
6 C.F.R. § 37.3 ........ 9
16 C.F.R. § 312 ........ 6, 8
17 C.F.R. § 227.305(b) ........ 8
17 C.F.R. § 248.3(u)(2)(F) ........ 8
32 C.F.R. § 310.4 ........ 9
32 C.F.R. § 311.3(g) ........ 9

32 C.F.R. § 329.3 .......... 9

34 C.F.R. § 99.3 .......... 8

34 C.F.R. § 303.29 .......... 8

45 C.F.R. § 164.514(b) .......... 6

45 C.F.R. § 164.514(b)(2)(i) .......... 8

**OTHER AUTHORITIES**

4 Blackstone, Commentaries 168 (1765) .......... 22

Edward J. Bloustein, *Privacy as an Aspect of Human Dignity: An Answer to Dean Prosser*, 39 N.Y.U. L. Rev. 962 (1964) .......... 23

Restatement (Second) of Torts § 874 .......... 20

## I. PRELIMINARY STATEMENT

Plaintiffs filed this class action against Defendants for privacy violations. The health care Defendants[1] disclosed, and continue to disclose, sensitive medical communications with their website users to Facebook without the users' knowledge and consent and in violation of the health care Defendants' explicit privacy promises. In turn, Facebook uses that sensitive information to sell targeted advertising. For these reasons, the Court should intervene and issue an Order requiring: (1) the health care Defendants who have not already done so, to remove Facebook source code from their websites that causes the disclosure of sensitive communications to Facebook tied to personally-identifiable information ("PII") including, but not limited to, cookies, IP addresses, and browser-fingerprint information; and (2) for websites controlled by the health care Defendants that do not currently include source code which causes disclosures to Facebook, to refrain from putting source code back on their websites that causes the disclosures complained of. Plaintiffs finally request that the Court retain jurisdiction over this matter to ensure that the health care Defendants comply with their obligations under the aforementioned statutes.

## II. STATEMENT OF FACTS

### A. Facts Alleged in the Complaint

This action seeks damages and injunctive relief for privacy violations on the websites Cancer.org, Cancer.net, Melanoma.org, ShawneeMission.org, BarnesJewish.org, ClevelandClinic.org, MDAnderson.org, and other health care and hospital websites maintained by the health care Defendants. As alleged in the Complaint, Plaintiffs' sensitive health-related communications with Defendants' websites were harvested and sent to Facebook by the health care Defendants. Compl. ¶¶ 1-5, 35. Facebook then profited from Plaintiffs' sensitive medical information by using it for marketing purposes. *Id*. ¶¶ 1-5, 88-91. The disclosure, tracking, and use of Plaintiffs' sensitive medical information for direct marketing were all done without Plaintiffs' knowledge or consent, in violation of their privacy rights and in violation of the health care Defendants' privacy policies. *Id*. ¶¶ 1-5, 35-36,

---

[1] Health care Defendants includes the following defendants: American Cancer Society, Inc.; American Society of Clinical Oncology, Inc.; Melanoma Research Foundation; Adventist Health System; BJC Healthcare; Cleveland Clinic; and University of Texas – MD Anderson Cancer Center.

39.

**B. Post-Filing Expert Research**

In their Motion to Dismiss, Defendants argue "this lawsuit is simply an attack on the way the Internet works."[2] However, post-filing research by expert Timothy Libert ("Libert") reveals just how empty the Defendants' rhetoric is. As attested to in the Libert Declaration accompanying this Motion ("Libert Decl."), the health care Defendants' disclosures to Facebook are simply not "the way the Internet works" and are, rather, a frightening example of the loss of privacy on the Internet.

**C. How Internet Browsers Work and the Disclosure Process**

Internet users employ web browsers, such as Apple Safari, Google Chrome, Microsoft Internet Explorer, Microsoft Edge, Mozilla Firefox, and Opera, to send and receive electronic communications. Libert Decl. ¶¶ 3, 5. Web browsers are software applications that allow consumers to send, receive, and view electronic communications on the Internet. *Id.* ¶ 4. Every web site is hosted by a computer server through which it sends and receives communications with Internet users via their web browsers to display web pages on users' monitors and screens. *Id.* ¶ 6. A web page is displayed on an end-user's screen through the processing of "source code," which is written in the Hypertext Markup Language (HTML). *Id.* ¶ 7. Source code contains the written instructions that allow a user's web browser to display content and text, manage user interactions with the page, and other such tasks. *Id.* Although a web page appears on a user's screen as a complete product, it is, in reality, an assembled collage of independent elements which may be visible or non-visible. *Id.* ¶ 8. The page source code instructs

---

[2] By propounding a universal defense to Internet privacy claims, the Defendants' argument in this case resembles one rejected by the Supreme Court in *Lee v. Florida*, 392 U.S. 378 (1968), a pre-Wiretap case in which police argued that party-line telephone conversations were not protected by the Wiretap Act's precursor because "people who use party lines should realize that their conversations might be overheard." *Id*. at 380-81. The Court disagreed, explaining that the case was not one where "the police merely picked up the receiver on an ordinary party line[,]" but instead, "deliberately arranged to have a telephone connected to Lee's line without his knowledge, and they altered that connection in such a way as to permit continuous surreptitious surveillance and recording of all conversations on the line." *Id*. at 381. In this case, the communications at issue are not ordinary Internet communications, but instead sensitive health care communications with health care Defendants who explicitly promise not to disclose personally-identifiable information to third-parties. This Court previously expressed skepticism over Facebook's "universal defense" to all Internet privacy actions. *See In re: Facebook Internet Tracking Litig*., Mot. to Dismiss Hr'g Tr. 30:7-11 ("THE COURT: It sounds like you're propounding a universal defense which is that's the way the Internet works, folks, and get over it. MR. BROWN: Yeah, I mean, I wouldn't want to be flippant about it by any means."). Similar to *Lee*, this Court should reject Defendants' attempts to make the Internet a privacy dead zone.

which servers to download elements from and those tasks are carried out by the web browser. *Id.* ¶ 9. The source code instructions also permit the use of "cookies" – small text files that may be used to store and transmit data whenever a user's web-browser interacts with a given web-server, often in furtherance of data collection, behavioral profiling, and targeted advertising. *Id.* ¶ 25. HTML source code is normally read, or 'parsed,' in order from top to bottom and left to right. *Id.* ¶ 10. Therefore, code that is written closer to the top of the instructions is often executed before other, later, code. *Id.*

Web browsers utilize the Hypertext Transfer Protocol (HTTP) to initiate Internet connections to web servers in order to download specific web pages and files such as images. *Id.* ¶ 11. One of the basic HTTP commands web browsers use to communicate with web servers is called the 'GET command' or 'GET request;' another is the 'POST command' or 'POST request.' *Id.* Each HTTP request contains several fields of data, called 'headers.' *Id.* ¶ 12. Among these headers are (1) the 'referer' which is the address of either the page a user clicked to reach the current page, or the page currently being rendered, and (2) the 'user-agent' field which identifies the type of computer and web browser being utilized. *Id.*; *see also id.* ¶ 13 (providing an example of the GET request process). Upon receiving and processing the HTML source code, the user's web browser is commanded to initiate many distinct and contemporaneous HTTP requests to both the intended first party web server, and additional third-party web servers. *Id.* ¶ 14. The contemporaneous HTTP requests to third-parties is initiated through each individual Internet user's web browser at the instruction of source code without any further action or knowledge of the user, often leaving the user unaware that additional parties have been contacted or that personal web browsing habits and interests have been transmitted. *Id.* ¶ 21. The third-parties even acquire the communications before the web site has completed rendering on the user's web browser. *Id.* ¶ 23.

Once the user has instructed the browser to download a page, the browser follows the commands contained in the source code of the page. *Id.* ¶ 15. Beyond instructing the browser which page to display, the user has little direct involvement in rendering the page: the source code is in control. *Id.* The entire process happens in milliseconds, with the precise length of time from original HTTP request to final element request determined by the user's computer capabilities, Internet speed, and the speed of the web server and server(s) to which the user's referer URL and HTTP requests are

contemporaneously initiated. *Id.* ¶ 23. Expert Tim Libert's Declaration explains the specific process at issue here, through which disclosures are made to Facebook by the health care Defendants. *Id.* ¶¶ 13, 26-38, 42, 46, 49, 51, 56-64.

**D. Post-Filing Disclosures**

Libert's research reveals that some of the health care Defendants in this case stopped engaging in the offensive behavior on the vast majority of websites they control in the months after the filing of this action. Libert Decl. ¶¶ 26, 28-29. For example, as of July 12, 2016, 56 of the 68 websites (82 percent) controlled by the health care Defendants were no longer engaged in behavior causing the disclosure of PII to Facebook. *Id.* ¶ 28. However, as of September 9, 2016, 48 of the 68 websites (70 percent) controlled by the health care Defendants were no longer engaged in behavior causing the disclosure of PII to Facebook. *Id.* ¶ 29. Specific examples of health care Defendants' post-filing behavior is listed below:

- Defendants American Society of Clinical Oncology and Cleveland Clinic removed all offending source code from the websites they control as of July 29, 2016, and July 12, 2016, respectively. Libert Decl. ¶¶ 30, 35. However, as of September 9, 2016, both Defendants were making disclosures to Facebook through the Javascript code mechanism. *Id.*

- Defendant Adventist Health System removed offending source code from 46 of the 49 hospital websites over which it has control, including ShawneeMission.org. Libert Decl. ¶¶ 28-29.

- Defendants American Cancer Society, Melanoma Research Foundation, and MD Anderson continue to employ source code that causes the disclosure of PII to Facebook. Libert Decl. ¶¶ 28-29.

- Defendant BJC Healthcare continues to employ source code that causes the disclosure of PII to Facebook on the websites of seven hospitals under its control, including BarnesJewish.org. Libert Decl. ¶¶ 28-29. However, it does not disclose PII to Facebook on seven websites under its control, including the parent website www.BJC.org. *Id.*

These findings from Libert's research show that disclosures from the websites of numerous prominent HIPAA-covered health care entities are not necessary for those websites to function. And, in fact, it is possible to use Facebook source code without the disclosures complained of herein. As described by Libert, web developers for Adventist left notes in the source code on six Adventist-controlled websites, explaining the dates that source code, which results in disclosures to Facebook, was removed and then

re-enabled. Libert Decl. ¶32 ("removed Google Tag Manager[3] [jmayerberry (WSOL) 8/25/2016," "Updated: re-enabling Google Tag Manager per email request from Kevin Guill [jmayberry (WSOL) 8/31/2016]"). The post-filing behavior of Defendant Adventist specifically illustrates that disclosures to Facebook are not necessary for a website to operate.

**E. The Timing of Disclosures**

Libert's research further reveals exactly how the health care Defendants' disclosures to Facebook are made contemporaneous to the communications the health care Defendants are having with the Plaintiffs. As Libert explains, "Facebook specifically instruct[s] web-developers [to] place the Facebook Javacript code 'ideally right after the opening <body> tag.'" Libert Decl. ¶¶ 56-57. "By suggesting that its code appear 'ideally right after the opening <body> tag,' Facebook is seeking to have its instructions executed early in the page rendering process, often before other parts of the page are processed." *Id.* ¶ 57.

As just one example, at BarnesJewish.org, Libert's research revealed the following timeline in milliseconds for a communication between Libert and BJC Healthcare, during which BJC Healthcare contemporaneously sent the communication and PII to Facebook:

- 17:36:45.829Z[4] – Initial communication from the user to BJC Healthcare. *Id.* ¶ 58a.
- 17:36:49.467Z – PII sent to and acquired by Facebook. *Id.* ¶ 58b.
- 17:36:56.043Z – Communication between user and BJC Healthcare completed. *Id.* ¶ 58c.

Libert's research does not, and could not, also account for the fact that it takes a user time to visually and mentally process the communication received from BarnesJewish.org. Although the communication is fully rendered on the user's web-browser in about ten seconds, the communication is still ongoing as the Internet user actually receives the information by reading it.

Libert's research reveals that even where a website places Facebook source code in a different location than Facebook suggests (i.e. not "right after the opening <body> tag"), Facebook still acquires PII before the communication is complete. Libert Decl. ¶¶ 60-62. As just one example, at

[3] In addition to using source code directly from Facebook, some websites use Google Tag Manager, which manages all source code included on that website, including Facebook source code. This is explained in more detail in paragraph 36 of the Libert Decl.

[4] The timestamp "17:36:45.829" is read in 24-hour format so that this entry would mean the exchange took place at 5:36 p.m. and the three exchanges set out occurred over the course of 10.214 seconds.

Melanoma.org, Libert's research revealed the following timeline for a communication between Libert and Melanoma Research Foundation ("MRF"):

- 18:51:01.675Z[5] – Initial communication from the user to MRF. *Id.* ¶ 62a.
- 18:51:03.095Z – PII sent to and acquired by Facebook. *Id.* ¶ 62b.
- 18:51:03.597Z – Communication between user and MRF completed. *Id.* ¶ 62c.

As with the communication with BJC, the communication here is fully rendered on the user's web-browser as of 18:51:03.597, but the communication is still ongoing as the Internet user reads it.

**F. The Nature of the Information Disclosed**

Based on Facebook's own public acknowledgements, Libert opines that Facebook "downloads and processes (or 'scrapes') the entire content of every web site with Facebook code on its pages." Libert Decl. ¶ 44. "Through its scraping process, Facebook has knowledge of each of the [health care Defendants'] status as sensitive health care websites, including medical providers[.]" *Id.* ¶ 45. In addition to learning the entire content of every webpage on which its source code appears through this scraping process, the "source code on the health care websites discloses to Facebook the precise names of articles and medical interests that are communicated between each user and each health care website." *Id.* ¶ 46. For example, a user communicating with Defendant American Cancer Society ("ACS") seeking information on prostate cancer would do so by sending a communication to ACS in the form of http://www.cancer.org/cancer/prostatecancer/index. *Id*. Contemporaneous to this request, the source code on ACS' website, Cancer.org, will transmit the text "cancer/prostatecancer" to Facebook. *Id.* ¶ 47. In addition to acquiring the information "cancer/prostatecancer," Facebook also acquires cookies, IP addresses, and device and browser identifiers via HTTP requests. *Id.* ¶ 49. As discussed below, this information is PII by law and practice. *See, e.g.*, 45 C.F.R. § 164.514(b).[6]

**G. Declarations of the Class Representatives**

The three named Plaintiffs in this case sent and received communications relating to and

---

[5] As explained *supra*, this entry indicates the exchange took place at 6:51 p.m. and all of the exchanges occurred over the course of 1.922 seconds.

[6] In addition to HIPAA, this type of information qualifies as PII under the Children's Online Privacy Protection Act (COPPA), 15 U.S.C. § 6501 at 16 C.F.R. § 312; the Gramm-Leach Financial Modernization Act, 15 U.S.C. § 6801 at 17 C.F.R. §248.3(u)(2)(F); and the Federal Education Rights and Privacy Act (FERPA), 20 U.S.C. § 1232 at 34 C.F.R. § 99.3.

containing health information that was confidential, private, and personal. Declaration of Jane Doe I ("Doe I Decl.") ¶ 2; Declaration of Jane Doe II ("Doe II Decl.") ¶ 2; Declaration of Winston Smith ("Smith Decl.") ¶ 2. The Plaintiffs did not consent, in any form, to disclosure of their communications with the health care Defendants to Facebook. Plaintiffs declare under penalty of perjury, "It is none of Facebook's business what communications I am sending to [a health care website] or any other website that promises not to disclose my personally-identifiable information to third-parties." Doe I Decl. ¶ 6; Doe II Decl. ¶ 6; Smith Decl. ¶ 6. Disclosure of personal health-related communications without their consent has caused the Plaintiffs irreparable harm. Doe I Decl. ¶ 5; Doe II Decl. ¶ 5; Smith Decl. ¶ 5. What was once private, is no longer so. Health care Defendants' continued unauthorized disclosures create additional irreparable harm for others in the Plaintiffs' positions. Doe I Decl. ¶ 7; Doe II Decl. ¶ 7; Smith Decl. ¶ 7.

## III. LEGAL ARGUMENT

This Motion seeks an order (1) requiring the health care Defendants that have not yet removed Facebook source code that causes the disclosure of sensitive communications to Facebook tied to PII from their websites to do so, and (2) enjoining the health care Defendants that have removed Facebook source code causing the disclosure of PII to Facebook to maintain the new status quo by keeping their websites free from source code that causes such disclosures.

The general basis for injunctive relief is irreparable injury to the moving party and the inadequacy of legal remedies. *See Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982); *Stanley v. University of So. Calif.*, 13 F.3d 1313, 1320 (9th Cir. 1994). Injunctive relief is appropriate where the plaintiff establishes: (1) it is likely to succeed on the merits of its claims; (2) it will likely suffer irreparable harm in the absence of injunctive relief; (3) the balance of equities tips in its favor; and (4) an injunction is in the public interest. *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 20 (2008). All four of these elements are met here. Plaintiffs also move pursuant to California Penal Code section 637.2(b) which specifically provides that a person may bring an action to enjoin and restrain any violation of the Act.

**A. Plaintiffs' Claims Are Likely to Succeed on the Merits**

To show "likelihood of success on the merits," a plaintiff need not show with absolute certainty that he will prevail. *See Drakes Bay Oyster Co. v. Jewell*, 729 F.3d 967, 979 (9th Cir. 2013). Rather, a reasonable probability of success, not an overwhelming likelihood, is all the law requires. *See Gilder v. PGA Tour, Inc.*, 936 F.2d 417, 422 (9th Cir. 1991) (stating likelihood of success does not require showing success is "more likely than not."). Here, there are two issues relevant to each claim: (1) the nature of the data disclosed is PII; and (2) the Plaintiffs' lack of consent to the conduct at issue. As those are all satisfied, the requested relief should be granted.

**1. <u>The Information Disclosed Is Legally-Protected PII</u>**

As Libert attests in his Declaration, the health care Defendants disclose to Facebook, in real-time, details about the communications that Internet users make with the health care Defendants' websites, combined with information including the Plaintiffs' cookies, IP addresses, and device or browser identifiers. Libert Decl. ¶ 49. This information is considered PII under both federal laws and the common meaning of the term "personally identifiable."

Under HIPAA, information is considered protected personal health information ("PHI") unless it is scrubbed of a list of "identifiers" that include geographic subdivisions smaller than a state, device identifiers and/or serial numbers, URLs, IP addresses, and other unique identifying numbers, characteristics or code. 45 C.F.R. § 164.514(b)(2)(i). In addition to HIPAA and the Department of Health, this type of information qualifies as PII under regulations and guidelines set forth by the National Institute of Standards and Technology,[7] the Federal Trade Commission,[8] the Department of Education,[9] the Securities and Exchange Commission,[10] the Department of Defense,[11] the Department

[7] *See* NIST PII Guide §§2.1-2.2.

[8] *See* 2012 FTC Privacy Report at 18-22 https://www.ftc.gov/sites/default/files/documents/reports/federal-trade-commission-report-protecting-consumer-privacy-era-rapid-change-recommendations/120326privacyreport.pdf; *see also* Children's Online Privacy Protection Act (COPPA), 15 U.S.C. § 6501, as implemented by FTC regulation at 16 C.F.R. § 312.

[9] Federal Education Rights and Privacy Act (FERPA), 20 U.S.C. § 1232, as implemented by regulation at 34 C.F.R. § 99.3, 303.29.

[10] Gramm-Leach Financial Modernization Act, 15 U.S.C. § 6801, as implemented by regulation at 17 C.F.R. § 227.305(b) and 248.3(u)(2)(F).

of Homeland Security,[12] the Office of Management and Budget,[13] and new proposed regulations of the Federal Communications Commission regarding the Privacy of Customers of Broadband and Other Telecommunications Services.[14]

Further, a public government report from Belgium and Facebook's own public statements and practices show that the information is personally-identifiable to Facebook. As set forth in Libert's Declaration, a report prepared for the Belgian Privacy Commission explained that Facebook's "c_user" cookie is a unique identifier attached to each Facebook member; its "datr" cookie is a unique identifier attached to each browser accessing Facebook;[15] its "lu" cookie is a unique identifier used to denote the last Facebook user to log-in to Facebook from the browser in use; and the "fr" cookie is a unique identifier containing an encrypted version of the "datr" and "lu" cookies. Libert Decl. ¶51.

Facebook has publicly stated that it connects IP addresses and device and browser information to personal details about its users:

> We collect information from or about the computers, phones, or other devices where you install or access our Services, depending on the permissions you've granted. We may associate the information we collect from your different devices, which helps us provide consistent Services across your devices. Here are some examples of the device information we collect: Attributes such as … device identifiers [and] [c]onnection information such as … IP address.

Compl. ¶ 100, Ex. B at 2.[16]

---

[11] *See* 32 C.F.R. §§ 310.4, 311.3(g), 329.3.

[12] *See* 6 C.F.R. § 37.3.

[13] 2 C.F.R. § 200.79. Clay Johnson, Deputy Dir. of Mgmt., OMB, Safeguarding Against and Responding to the Breach of PII, https://www.whitehouse.gov/sites/default/files/omb/memoranda/fy2007/m07-16.pdf

[14] *See* https://apps.fcc.gov/edocs_public/attachmatch/FCC-16-39A1.pdf at 20-23.

[15] Proving that "datr" cookies are attached to particular Facebook users, beginning in 2015, Facebook has allowed users to learn the last four digits of every datr cookie ever connected to their account. Libert Decl. ¶51b.

[16] In a recent letter to Congress, Facebook joined other digital companies in asserting that proposed legislation to allow government tracking of mere IP addresses without court oversight raises significant "civil liberties and human rights concerns[.]" (https://www.ccianet.org/wp-content/uploads/2016/06/ECTR-Coalition-Letter-6-6-1.pdf. By merely tracking IP addresses, Facebook warned, the government could "paint an incredibly intimate picture of an individual's life.…This information could reveal details about a person's political affiliation, *medical conditions*, religion, *substance abuse history*, sexual orientation, and…even his or her movements throughout the day." *Id.* (emphasis added).

To the extent there is any dispute about the meaning of the term PII or similar phrases as they exist in the privacy policies of the health care Defendants, any ambiguity must be interpreted in favor of the consumer Plaintiffs and privacy. *See Daniel v. Ford Motor Co*., 806 F.3d 1217, 1225 (9th Cir. 2015), citing *Neal v. State Farm Ins. Cos*., 10 Cal. Rptr. 781, 784 (1961) ("The rule that any ambiguities caused by the draftsman of the contract must be resolved against that party applies with peculiar force in the case of the contract of adhesion."). This logic is particularly forceful here, where the language in question comes from the privacy policies drafted by the health care Defendants and relied upon by Plaintiffs.

### 2. <u>The Plaintiffs Did Not Consent to the Health Care Defendants' Disclosures</u>

Plaintiffs anticipate that in opposing this Motion, Defendants will argue that Plaintiffs consented to the conduct complained of. However, as addressed in Plaintiffs' Opposition to Defendants' Motion to Dismiss (ECF No. 105), the Plaintiffs did not consent to the disclosure of their PII and health care communications to Facebook. *See* Declaration of Jason "Jay" Barnes ("Barnes Decl.") ¶ 13, Ex. O; Compl. Ex. F-L (Privacy Policies of the health care Defendants). Under the HIPAA and California Civil Code section 1798.91 tests, the health care Defendants' arguments fail because they did not obtain express, written, or knowing consent from the Plaintiffs before disclosing these communications.

Defendants' anticipated consent arguments also fail under the *Perkins* test they urged this Court to adopt in their MTD, namely, "Would a reasonable user who viewed [the defendants'] disclosures have understood that [Facebook] was collecting [the information at issue]?" Barnes Decl. ¶ 13, Ex. O at 18 (citing Def. MTD at 7-8); *Perkins v. LinkedIn Corp*., 53 F. Supp. 3d 1190, 1212 (N.D. Cal. 2014). As Plaintiffs argued previously, this misstates the question and leaves out half of the equation. Put in the context of this case the proper inquiry is whether a reasonable user would have understood that the health care Defendants were disclosing personally identifiable information about them to Facebook even though the health care Defendants' privacy policies explicitly promised not to share such information. The clear answer is no – a reasonable user would not have been apprised that the health care Defendants and Facebook were engaged in activity in direct violation of the health care Defendants' privacy policies.

In *Meyer v. Kalanick*, Judge Jed Rakoff explained that when examining a purported waiver of a constitutional right (trial by jury) in an Internet consumer "contract," courts must "indulg[e] every reasonable presumption against waiver." No. 15-Civ.-9796, 2016 WL 4073012 at *1 (S.D.N.Y. 2016). Judge Rakoff asked, "What about situations in which the consumer, by the mere act of accessing a service, is allegedly consenting to an entire lengthy set of terms and conditions?" *Id.* Citing then-Circuit Judge Sonia Sotomayor's opinion in *Specht v. Netscape*, 306 F.3d. 17, 35 (2002), Judge Rakoff pointed out that "reasonably conspicuous notice of the existence of contract terms and unambiguous manifestation of assent to those terms by consumers are essential if electronic bargaining is to have integrity and credibility." *Id*. Like *Meyer*, this case involves the Plaintiffs' attempt to vindicate Constitutional rights and invoke a "fundamental right" to privacy that the Supreme Court observed is "older than the Bill of Rights." *Griswold v. Connecticut*, 381 U.S. 479, 486 (1965); *see also, Norman-Bloodsaw v. Lawrence Berkeley Lab*., 135 F.3d 1260, 1269 (9th Cir. 1998) (privacy interests are of the utmost concern when they regard one's health). Waiver, therefore, cannot be presumed and must be unambiguous, and cannot be found to have occurred here.

**3. <u>The Wiretap Act</u>**

Title II of the Electronic Communications Privacy Act ("ECPA"), the "Wiretap Act," prohibits the (1) intentional and (2) unauthorized (3) interception of (4) the contents of (5) an electronic communication (6) through the use of a device. *In re: Pharmatrak*, 329 F.3d 9, 18 (1st Cir. 2003). There are exceptions to liability where a party to the communication has consented to the interception or the alleged interception is made by a party to the communication. 18 U.S.C. § 2511(2)(d). However, there is also an exception to those exceptions where a "communication is intercepted for the purpose of committing any criminal or tortious act." 18 U.S.C. § 2511(2)(d).

Plaintiffs re-state, with additional insight from the Libert Declaration, their legal arguments regarding the elements of "interception", "contents," "device," "consent," "party to the communication," and the exception to the exception for an interception accomplished "for the purpose of committing any criminal or tortious act" as set forth in their Opposition to Defendants' Motion to Dismiss. Barnes Decl. ¶ 13, Ex. O.

*a. Facebook Completed an "Interception"*

The ECPA defines "intercept" as the "acquisition of the contents of any . . . electronic communication[.]" Though it does not appear anywhere in the actual text of the ECPA, courts have interpreted the Act to require a defendant's acquisition to be "contemporaneous" to the sending or receipt of the captured or re-directed communication. In this case, and as explained above, Facebook's acquisitions occur within milliseconds of when a user hits Enter, and before the responsive communication from each respective heath care website is complete. *See* Libert Decl. ¶ 23. On many websites, this is by Facebook's own design. Facebook directs web-developers to place the Facebook source code "ideally right after the opening <body> tag" on each webpage. *Id.* ¶¶ 56-57.

Regardless of the fact that Facebook acquires the information in the middle of the Plaintiffs' and health care Defendants' communication, "[t]he entire process occurs within milliseconds and . . . the user has only made one knowing and purposeful communication – a GET request to the website with which they intended to send and receive communications, such as Cancer.org." *Id.* ¶ 48. This is contemporaneous under the ECPA. *See U.S. v. Szymuskiewicz*, 622 F.3d 701, 706 (8th Cir. 2010) ("Contemporaneous does not mean 'in flight' or 'in the middle' or any football metaphor," it is "contemporaneous by any standard" when a Wiretap defendant and the victim "receives each message with no more than an eye-blink in between."); *U.S. v. Councilman*, 418 F.3d 67, 76 (1st Cir. 2005) (*Councilman I*) (explaining overlaps between in transit and in storage with regard to the ECPA: "[B]road definition of . . . storage was to enlarge privacy protections for stored data . . . not to exclude email messages stored during transmission from these strong protections.").

When considered in a more traditional Wiretap setting, the actions here are no doubt illegal. For example, if instead of occurring over the Internet, the actions here occurred through the defendant placing a "bug" in a room where the victims were having a conversation at a conference table. The bug is hidden in a plant in the corner of the room. Basic physics tells us "[t]he speed of sound is a constant within a given gas[.]"[17] "At normal atmospheric pressure," the speed of sound is approximately 343

[17] https://www.grc.nasa.gov/www/k-12/airplane/sound.html

meters per second.[18] If the bug is located further away from a communication's recipient than the speaker is, the bug will only acquire the content of the communication after it has already been received by the intended recipient (for example, if the bug is located five meters away from the recipient, it will acquire the communication within milliseconds, but still 0.01457 seconds after it has already been received by the intended recipient). Depending on the defendant's precise location, it will take even longer before he actually acquires it. Regardless of his location, the defendant has still violated the Wiretap Act in this traditional setting. The same is true here. Indeed, the very purpose of the Wiretap updates contained within the ECPA of 1986 was to "extend[] to data and electronic transmissions *the same protection* already afforded to oral and wire communications." 132 Cong. Rec. S14441-04 (1986), 1986 WL 786307. As its paramount objective "is to protect effectively the privacy of communications" (*In re: Pharmatrak*, 329 F.3d 9, 18 (1st Cir. 2003)) that objective is only achieved if the activities complained of here are seen for what they are, an illegal "interception."

*b. Facebook Acquires "Content"*

Under the ECPA, content "includes any information concerning the substance, purport, or meaning of [a] communication." 18 U.S.C. § 2510(8). Detailed GET requests and "post-domain name portions of [a] URL . . . qualify as content." *In re: Google Cookie Placement*, 806 F.3d 125, 139 (3d Cir. 2014); *In re: Zynga Privacy*, 750 F.3d 1098, 1109 (9th Cir. 2014) (URLs contain content where they include "search term[s] or similar communication[s] made by the user[.]'); *Declassified Opinion from the FISC*, https://www.dni.gov/files/documents/1118CLEANEDPRTT%202.pdf (content and DRAS under ECPA not mutually exclusive); *In re: Application for Pen Register*, 396 F. Supp. 2d 45, 49-50 (D. Mass. 2005) ("Contents" include URL "subject lines, application commands, search queries, requested file names, and file paths."); *In re: Pharmatrak*, 329 F.3d at 18; H.R. Rep. 107-236 at 53, 294-296 (2001).

Here, Libert's Declaration states that Facebook acquires "content" in the form of detailed URLs and GET requests containing post-domain name portions of a URL. Libert Decl. ¶ 37.[19]

---

[18] http://www.physicsclassroom.com/class/sound/Lesson-2/The-Speed-of-Sound

[19] Libert's declaration lists examples of disclosures of detailed URLs to Facebook by each of the seven health care Defendants: http://www.cancer.org/cancer/colonandrectumcancer/index;

*c. Facebook Acquires Content of an "Electronic Communication"*

The ECPA defines an "electronic communication" as "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system that affects interest or foreign commerce" with exceptions that do not apply here. 18 U.S.C. § 2510(12). Internet communications, including GET and POST requests, fit this definition.

*d. Facebook Acquires Content through the Use of a "Device"*

Under the ECPA, "device" is defined by function. An "electronic . . . or other device" is "any device . . . which can be used to intercept a[n] . . . electronic communication." 18 U.S.C. § 2510(5). Web-servers and computers are devices under the ECPA. *Szymuszkiewicz*, 622 F.3d at 707. So are software and computer code. *In re: Carrier IQ, Inc., Consumer Privacy Litig.*, 78 F. Supp. 3d 1051, 1067 (N.D. Cal. 2015). Libert's Declaration explains how Facebook uses software (cookies), computers (the Plaintiffs', health care Defendants', and Facebook's web-servers), and computer code (Facebook source code placed on the web-pages of the health care Defendants' websites) to acquire electronic communications. *See generally* Libert Decl.

*e. Facebook Is Not a "Party to the Communication"*

The "party to the communication" exception is an affirmative defense for which a defendant claiming it has the burden of proof. *Pharmatrak*, 329 F.3d at 19. Nevertheless, Plaintiffs address the issue in this Motion in anticipation of Defendants raising it.

In the Motion to Dismiss, Facebook claimed to be a "party to the communication[s]" between the Plaintiffs and the health care Defendants. However, as this Court has previously pointed out, this defense must fail "because Plaintiffs allege they were unaware that Facebook was surreptitiously tracking them." *In re: Facebook Internet Tracking Litigation*, Dkt. 44, Oct. 23, 2015, at 17-18. "Thus, while it is true that a Facebook server was involved, there are no allegations … which demonstrate that

---

http://www.cancer.net/cancer-types/colorectal-cancer; http://www.barnesjewish.org/Health-Library/View-Content?contentTypeId=42&contentId=ColorectalCancerRisk; http://pages.clevelandclinic.org/colon-cancer-index.html; https://www.melanoma.org/understand-melanoma/pediatric-melanoma; https://www.avistahospital.org/AVH/Specialties/GI/Colonoscopy/.

Plaintiffs knew that fact while their [communications] were being tracked and collected." *Id.* at 18.[20] And, in *U.S. v. Eady*, No. 15-3287, 2016 WL 2343212, at *2 (3d Cir. May 4, 2016), a criminal wiretap case, a three-judge panel adopted a definition of "party to the communication" consistent with this Court's interpretation. There, the court upheld a jury instruction defining an ECPA "party to the communication" as an individual who engages in a communication with at least one other individual whose participation is known at the time. Finding liability, the panel explained, "a defendant does not actually participate in a conversation unless his presence is known to the other participants." *Id.* at *3.

In this case, Facebook, unknowingly to the Plaintiffs, acquires the contents of communications sent and received from the health care Defendants through a separate path than the actual communication between the Plaintiffs and the health care Defendants' websites. For example, during Libert's research, his initial communication was with Defendant BJC Healthcare via BarnesJewish.org, but it was ultimately sent to and acquired by Facebook. Libert Decl. ¶¶ 58a-58b. Again, the Plaintiffs did not consent to and, in fact, were completely unaware that Facebook acquired the contents of their communications with the health care Defendants – each of which explicitly promised not to disclose personally-identifiable information to Facebook in their own privacy policies. *See* Compl. Ex. F-L (Privacy Policies of the health care Defendants). Thus, this Court should again find that Facebook is not a "party to the communication." To rule otherwise would obliterate the Electronic Communications Privacy Act, effectively repealing it for the most common form of electronic communication today – the HTTP GET request.

*f. Intentional Post-Filing Conduct*

Without the benefit of discovery, Plaintiffs' Complaint was agnostic as to whether the health care Defendants were knowingly disclosing PII to Facebook. Upon notice of the Plaintiffs' claims, some health care Defendants have removed offending source code from some of their websites, tending to show (but not proving) that the pre-filing conduct may not have been intentional. However, for the health care Defendants who are still disclosing information to Facebook, or who stopped making

[20] Indeed, other than the Third Circuit in two recent cases, no court has ever held that a third-party cookie company is actually a "party to the communication" between an Internet user and the website with which they are communicating.

disclosures to Facebook after the filing of this action and started making such disclosures again, the disclosures are now knowing. These Defendants include American Cancer Society, Melanoma Research Foundation, Adventist Health System (for a slim minority of its websites), BJC Healthcare, and MD Anderson (via disclosure to Liverail). Libert Decl. ¶¶ 26-28.

For the Defendants who have removed offending source code from their websites, Plaintiffs seek an order requiring them to maintain the status quo. For the Defendants who have not removed offending code, Plaintiffs seek an order requiring them to stop and point the Court to the ECPA's exception to the exception for interceptions done for a "criminal or tortious purpose."

*g. Post-Filing Disclosures Have Criminal and Tortious Purposes*

Defendants are liable under the ECPA even where a party has consented or the defendant is deemed a party to the communication where "such communication is intercepted [i.e. acquired] for the purpose of committing any criminal or tortious act in violation of . . . the laws of the United States or of any State." 18 U.S.C. § 2511(2)(d). In *Sussman v. ABC*, the Ninth Circuit explained that this exception to the exception focuses "upon whether the purpose for the interception – its intended use – was criminal or tortious . . . . Where the taping is legal, but is done for the purpose of facilitating some further impropriety . . . section 2511 applies." 186 F.3d 1200, 1202 (9th Cir. 1999).

In this case, the Plaintiffs have valid causes of action regardless of the particular method (Internet tracking via source code, content, and PII) through which the Defendants disclosed and tracked their sensitive health communications and information. As explained below, if the health care Defendants disclosed to Facebook a list of their patients or prospective patients (along with the general content of their communications) with any or no profit motive, the conduct would still be tortious even if it did not occur contemporaneously. Accordingly, the health care Defendants that have continued to engage in the offending activity post-filing have placed themselves into the "criminal and tortious purpose" category for those post-filing actions.

**4. <u>CIPA Applies to the Actions of the Health Care Defendants and Plaintiffs Are Likely to Prevail on their Claims</u>**

The California Invasion of Privacy Act (CIPA) mirrors the federal Wiretap Act with a few important exceptions. Cal. Pen. Code § 631, et. seq. First, California is an all-party consent state,

requiring a defendant to obtain the consent of all parties to a communication before they "in any unauthorized manner, read, attempt[] to read, or to learn the contents or meaning of any message, report, or communication[.]" Cal. Pen. Code § 631(a). In this case, Facebook did not have the consent of the Plaintiffs to acquire their communications with the health care Defendants in violation of those health care Defendants' explicit privacy promises. Second, CIPA explicitly does not require the defendant to use a device. Instead, it prohibits activity "by means of any machine, instrument, or contrivance, or in any other manner[.]" Cal. Pen. Code § 631(a). Third, CIPA section 632 creates liability for a defendant deemed a "party to a confidential communication" who records the communication by means of "any electronic amplifying or recording device." Cal. Pen. Code § 632. It is clear that Facebook was not a "party" to the communications between Plaintiffs and the health care Defendants' websites. However, even should this Court decide that Facebook was a party to these communications, Plaintiffs had an objectively reasonable expectation of privacy in their conversations with the health care Defendants. Therefore, this Court should find that Plaintiffs have a reasonable probability of success on the merits of their CIPA cause of action.

Further, California law applies to all Defendants here. Defendant Facebook is headquartered in California, directs its internet tracking activities from California, receives tracked internet communications in California, and utilizes a binding Terms of Use adopting California law to govern all disputes with Facebook members. Upon information and belief, it also required the web-developers for all of the health care Defendants to agree to its Terms of Use adopting California law to govern disputes with developers and websites utilizing Facebook code. As such, the health care Defendants are subject to California law for conduct relating to Facebook's source code. Further, even in the absence of Facebook's Terms of Use, through the Facebook source code, the health care Defendants send all HTTP communications to Facebook in California. Thus, the health care Defendants avail themselves of California law each and every time they send information to Facebook.

**5. <u>Plaintiffs Are Likely to Prevail on their Intrusion Upon Seclusion Claims</u>**

To succeed on a claim of intrusion upon seclusion under California law, a plaintiff must show an intentional intrusion on his solitude or seclusion that is highly offensive to a reasonable person. *Shulman v. Group W Prods.*, 18 Cal. 4th 200, 231 (1998). The plaintiff needs an objectively reasonable

expectation of seclusion or solitude in the place, conversation, or data source at issue. *Id*. at 232.

Here, Plaintiffs had an objectively reasonable expectation of privacy in the communications and data they exchanged with the health care Defendants' websites based on the health care Defendants' privacy policies and HIPAA. As discussed above, Defendant Facebook's source code was purposefully designed to collect the content of Plaintiffs' communications with the health care Defendants' websites together with personal identifiers.

Whether conduct is "highly offensive" is generally a mixed question of law and fact. *Hill v. NCAA*, 7 Cal. 4th 1, 40 (1994). By enacting criminal and civil statutes forbidding the practices at issue, Congress and every state have made policy decisions that this type of conduct is highly offensive to a reasonable person. *See* Compl. ¶ 301 (Wiretap Act, Pen Register Act, CFFA and 50 state analogues, CIPA, HIPAA, and, for Facebook, Cal. Civ. Code § 1798.91). As healthcare providers subject to HIPAA, the health care Defendants' blatant violation of their own privacy policies is highly offensive (as is Defendant Facebook's conduct in taking information without Plaintiffs' knowledge or authorization). *See Opperman v. Path*, 87 F. Supp. 3d 1018, 1061 (N.D. Cal. 2014) (ruling that the "surreptitious theft of personal contact information" could be deemed highly offensive). Therefore, this Court should find that Plaintiffs have a reasonable probability of success on the merits of their intrusion upon seclusion cause of action.

**6. <u>Plaintiffs Are Likely to Prevail on their Claims for Violations of their Privacy Rights Under the California Constitution</u>**

A private cause of action exists under Article I, section 1 of the California Constitution for invasion of privacy where the plaintiff has a legally protected privacy interest and a reasonable expectation of privacy, and the intrusion is so serious as to constitute an egregious breach of social norms. *Hill*, 7 Cal. 4th at 37.

As discussed above, HIPAA and the health care Defendants' explicit privacy policies gave Plaintiffs a reasonable expectation of privacy in the communications and data they exchanged with the health care Defendants' websites. Defendants' invasion of Plaintiffs' privacy in these communications is sufficiently serious to constitute a breach of social norms, in that health-related communications and records are among the types of information Americans hold the most secret and are accordingly

protected by federal and state law. Plaintiffs' privacy interests in these sensitive internet communications with the health care Defendants are legally protected by the Wiretap Act, the Pen Register Act, the Computer Fraud and Abuse Act, CIPA, HIPAA, and California Civil Code § 1798.91. Therefore, this Court should find that Plaintiffs have a reasonable probability of success on the merits of this cause of action.

**7. Plaintiffs Are Likely to Prevail on their Negligence Per Se Claims**

A presumption of negligence occurs when: (1) the defendant violated a statute, ordinance, or regulation of a public entity; (2) the violation proximately caused injury; (3) the injury resulted from an occurrence of the nature that the statute, ordinance, or regulation sought to prevent; and (4) the person suffering the injury is part of the class of persons for whose protection the statute, ordinance, or regulation was adopted. Cal. Evid. Code § 669(a).

There is a reasonable likelihood that Defendants' conduct violated various state and federal statutes, including the Wiretap Act, the Pen Register Act, the CFAA, CIPA, and HIPAA (and, for Facebook, California Civil Code 1798.91), all of which seek to prevent invasions of privacy. And, health care Defendants' actions of tracking and facilitating tracking of Plaintiffs' PII and health information violates these laws which directly and proximately caused Plaintiffs' injury – namely, the invasion of their privacy. As internet users and persons who are the subject of protected health information, Plaintiffs and the Classes they represent are clearly part of the classes of persons these statutes seek to protect. Therefore, Plaintiffs have a reasonable probability of success on their negligence per se cause of action.

**8. Plaintiffs Are Likely to Prevail on their Claims for Negligent Disclosure of Confidential Information**

To prevail on a claim of negligent disclosure of confidential information, the plaintiff must show a duty to keep confidential information private, breach of said duty, and that said breach caused damages. Cal. Civ. Code. §§ 56.10, 56.36.

Under HIPAA, Defendants Adventist, BJC Healthcare, Cleveland Clinic, and MD Anderson have a duty to keep Plaintiffs' medical communications private. In addition, each health care Defendant undertook a duty to abide by the privacy policies on their respective websites. By placing Facebook's

source code on their websites, which caused the disclosure of Plaintiffs' sensitive medical communications and PII to Facebook, the health care Defendants breached their duty. The design of the health care Defendants' websites caused Plaintiffs' confidential communications to be sent to Facebook and, as a result, Plaintiffs suffered an invasion of their privacy. Therefore, this Court should find that Plaintiffs have a reasonable probability of success on the merits of a negligent disclosure of confidential information cause of action.

**9. <u>Plaintiffs Are Likely to Prevail on their Claims for Breach of the Fiduciary Duty of Confidentiality</u>**

To prevail in a claim for breach of the fiduciary duty of confidentiality, the plaintiff must show the existence of a fiduciary duty, breach of said duty, and that said breach caused damages. Restatement (Second) of Torts, § 874.

The health care Defendants are covered entities under HIPAA and have a fiduciary duty to maintain the confidentiality of medical information from users of their websites. All of the health care Defendants, through their privacy policies and confidential relationship with Plaintiffs and the Class, created a fiduciary duty to maintain the confidentiality of medical communications and information from users of their websites. The health care Defendants breached this duty by programming their websites such that they disclosed to, and permitted, Facebook to track Plaintiffs' confidential medical communications and PII. The health care Defendants' breach of this duty caused Plaintiffs damages in that their personally-identifiable confidential medical information and communications, which they intended to be private and reasonably believed would remain private, were disclosed to, tracked, and intercepted by Defendant Facebook without Plaintiffs' consent. Therefore, this Court should find that Plaintiffs have a reasonable probability of success on the merits of a breach of fiduciary duty of confidentiality cause of action.

**B. Plaintiffs Will Suffer Irreparable Harm Absent Injunctive Relief**

The legal standard for injunctive relief requires that a plaintiff "demonstrate that irreparable injury is likely in the absence of an injunction." *Natural Res. Def. Council*, 555 U.S. at 8. Moreover, to show "irreparable harm," a plaintiff must demonstrate that the potential harm is imminent. *See Caribbean Marine Serv. Co. v. Baldridge*, 844 F.2d 668, 674 (9th Cir. 1988) ("a plaintiff must

*demonstrate* immediate threatened injury as a prerequisite to injunctive relief.").

To constitute irreparable harm, an injury must generally be certain, actual, and not merely theoretical. *Summers v. Earth Island Inst*., 555 U.S. 488, 493 (2009) (*citing Friends of Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc*., 528 U.S. 167, 180-81 (2000)). Here, the harm caused by health care Defendants' actions is certain and still ongoing. This Court should stop health care Defendants' illegal practice of disclosing personally identifiable health information to Facebook in violation of the above-referenced laws and each health care Defendant's explicit statements and policies regarding privacy.

Because most[21] of the health care Defendants are continuing to acquire Plaintiffs' personally identifiable medical information and transmit the same to Facebook, and Facebook is continuing to track this information, the harm to Plaintiffs and the Classes is ongoing. Without a preliminary injunction, the offensive behavior will continue to expand as more and more individuals visit the health care Defendants' websites with a reasonable expectation in the privacy of their sensitive medical communications and personally identifiable health information, only to have it disclosed to and used by Facebook. The removal of Facebook's source code, which causes disclosure of PII to Facebook, from the health care Defendants' websites would allow individuals to communicate with the health care Defendants' websites without having their privacy rights violated.

Because Plaintiffs and the members of the Classes have suffered and continue to suffer imminent and irreparable harm by Defendants' actions, this Court should find that injunctive relief is appropriate.

### C. The Balance of Equities Tips Sharply in Plaintiffs' Favor

A plaintiff seeking injunctive relief must establish that the balance of the equities tips in its favor. *See Natural Res. Def. Council*, 555 U.S. at 20. "A court balancing the equities will look to the possible harm that could befall the various parties." *Maxim Integrated Prods, Inc. v. Quintana*, 654 F. Supp. 2d 1024, 1036 (N.D. Cal. 2009).

An injunction preventing the health care Defendants from disclosing to Facebook all user communications at the health care Defendants' websites will not harm those Defendants as it will only

[21] *See, supra*, section II.D. of this Motion.

require compliance with HIPAA, the CFAA and the corresponding computer crime laws of all 50 states, CIPA, Article I, section 1 of the California Constitution, and other state laws. *See, e.g.*, *Pyro Spectaculars North, Inc. v. Sousa*, No. S-12-0299, 2012 WL 968084, *11 (E.D. Cal. Mar. 21, 2012) (holding an injunction would not cause significant hardship to defendant, because "it would essentially only require him to abide by existing law.").

On the other hand, if the health care Defendants are allowed to continue to disclose and divulge to Facebook thereby allowing Facebook to track and intercept the Plaintiffs' personal information combined with medical information and communications without the Plaintiffs' consent, Plaintiffs and the Classes will continue to face serious and substantial irreparable harm. Each day that goes by, more and more individuals unknowingly fall victim to Defendants' scheme, and the Classes are thereby enlarged. *See Indep. Living Ctr. of S. Cal., Inc. v. Shewry*, 543 F.3d 1047, 1049 (9th Cir. 2008) ("When the balance of harm 'tips decidedly toward the plaintiff,' injunctive relief may be granted . . . .") (quoting *Benda v. Grand Lodge of the Int'l Ass'n of Machinists & Aerospace Workers*, 584 F.2d 308, 315 (9th Cir. 1978)). Therefore, because the balance of equities tips sharply in Plaintiffs' favor, this Court should find injunctive relief is appropriate.

**D. The Injunctive Relief Sought Is in the Public Interest**

Here, the public interest weighs heavily towards granting Plaintiffs the relief they seek. Widespread recognition of privacy as a fundamental right precedes this nation's founding. *See Griswold v. Connecticut*, 381 U.S. at 486 ("We deal with a right of privacy older than the Bill of Rights . . . ."); *Berger v. New York*, 388 U.S. 41, 45 (1967) (Citing 4 Blackstone, Commentaries 168 (1765), describing "eaves-droppers" as "a common nuisance . . . preventable at the court, or . . . indictable at the sessions."). The value of this right to individuals is paramount. *See Kewanee Oil v. Bicron*, 416 U.S. 470, 487 (1974) ("A most fundamental human right, that of privacy, is threatened when industrial espionage is condoned or is made profitable; the state interest in denying profit to such illegal ventures is unchallengeable.").

As the Ninth Circuit has pointed out, this fundamental right to privacy finds its highest level of protection in medical information. *Norman-Bloodsaw*, 135 F.3d at 1269 ("One can think of few subject areas more personal and more likely to implicate privacy interests than that of one's health[.]"). In *Riley*

*v. California*, a unanimous Supreme Court held that Americans have a reasonable expectation of privacy in the type of data at issue in this case. 134 S.Ct. 2473, 2490 (2014) ("[C]ertain types of data are also qualitatively different. An Internet search and browsing history … could reveal an individual's private interests or concerns – perhaps a search for certain symptoms of disease, coupled with frequent visits to WebMD.").

American courts have long protected this right to privacy. The late Professor Edward Bloustein explained why:

> The fundamental fact is that our Western culture defines individuality as including the right to be free from certain types of intrusions. This measure of personal isolation and personal control over the conditions of its abandonment is of the very essence of personal freedom and dignity, is part of what our culture means by those concepts. A man whose home may be entered at the will of another, whose conversation may be overheard at the will of another, whose marital and family intimacies may be overseen at the will of another, is less of a man, has less human dignity, on that account. He who may intrude upon another at will is the master of the other and, in fact, intrusion is a primary weapon of the tyrant.

Edward J. Bloustein, *Privacy as an Aspect of Human Dignity: An Answer to Dean Prosser*, 39 N.Y.U. L. Rev. 962, 973-74 (1964). With its unquenchable thirst for data and unrelenting assault on the legal underpinnings of privacy rights that protect Americans against intrusions from both private and governmental actors, Facebook is creating a turn-key solution for totalitarianism through use of its code. If the health care Defendants in this case are deemed immune from this conduct, then so too would governmental actors be immune from the same or similar conduct.

As discussed above, the public's overarching interest in privacy, particularly as to matters concerning health and medical data, is evidenced by the statutory protections that exist for such sensitive information, including HIPAA. The Wiretap Act, the CFFA, CIPA, and other state computer crime laws protect the public's interest in maintaining secure and private electronic communications and evince broad legislative support thereof. Furthermore, there is a strong public interest in ensuring that companies abide by their promises, particularly those having to do with keeping individuals' confidential information private and free from disclosure to third parties.

Here, unless this Court issues an injunction, health care Defendants will continue to ignore their duties under HIPAA, the CFAA and the corresponding computer crime laws of all 50 states, CIPA, the California Constitution, and other state laws restricting disclosure of confidential information.

Therefore, because the injunction sought is in the public interest, this Court should find that injunctive relief is appropriate.

**IV. CONCLUSION**

Health care Defendants' scheme to disclose and divulge to Facebook, thereby allowing it to track and intercept the Plaintiffs' personal information combined with medical information and communications, without Plaintiffs' knowledge or consent, subjects Plaintiffs and the Classes to irreparable harm in violation of the public interest. Therefore, Plaintiffs seek an order requiring health care Defendants to remove all source code from their websites that cause the disclosure of PII to Facebook. By doing so, this Court will end health care Defendants' refusal to comply with their obligations under HIPAA, CFAA, and the corresponding computer crime laws of all 50 states, CIPA, Cal. Pen. Code § 630, the California Constitution, Art. I, sec. 1, and other state laws restricting disclosure of confidential information. Additionally, Plaintiffs seek an order requiring health care Defendants that have removed all source code from their websites that cause the disclosure of PII to Facebook to maintain the status quo. Finally, Plaintiffs respectfully request that the Court retain jurisdiction over this matter to confirm that health care Defendants comply with their obligations under all applicable laws and grant Plaintiffs their attorneys' fees and costs incurred in filing this Motion.

DATED: October 14, 2016 **KIESEL LAW LLP**

By: *_/s/ Jeffrey A. Koncius_*
Paul R. Kiesel
Jeffrey A. Koncius
Nicole Ramirez

**THE GORNY LAW FIRM, LC**
Stephen M. Gorny [Admitted *Pro Hac Vice*]
*steve@gornylawfirm.com*
Chris Dandurand [Admitted *Pro Hac Vice*]
*chris@gornylawfirm.com*
2 Emanuel Cleaver II Boulevard, Suite 410
Kansas City, MO 64112
Tel.: 816-756-5056
Fax: 816-756-5067

**BARNES & ASSOCIATES**
Jay Barnes [Admitted *Pro Hac Vice*]
*jaybarnes5@zoho.com*
Rod Chapel [Admitted *Pro Hac Vice*]
*rod.chapel@gmail.com*
219 East Dunklin Street, Suite A
Jefferson City, MO 65101
Tel.: 573-634-8884
Fax: 573-635-6291

**EICHEN CRUTCHLOW ZASLOW & McELROY**
Barry. R. Eichen [Admitted *Pro Hac Vice*]
*beichen@njadvocates.com*
Evan J. Rosenberg [Admitted *Pro Hac Vice*]
*erosenberg@njadvocates.com*
Ashley A. Smith [Admitted *Pro Hac Vice*]
*asmith@njadvocates.com*
40 Ethel Road
Edison, NJ 08817
Tel.: 732-777-0100
Fax: 732-248-8273

**THE SIMON LAW FIRM, P.C.**
Amy Gunn [Admitted *Pro Hac Vice*]
*agunn@simonlawpc.com*
800 Market St., Ste. 1700
St. Louis, MO 63101
Tel.: 314-241-2929
Fax: 314-241-2029

**BERGMANIS LAW FIRM, L.L.C.**
Andrew Lyskowski [Admitted *Pro Hac Vice*]
*alyskowski@ozarklawcenter.com*
380 W. Hwy. 54, Ste. 201
Camdenton, MO 65020
Tel.: 573-346-2111
Fax: 573-346-5885